## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:24-cv-00264-MR-WCM

| | | |
|---|---|---|
| **ANTHROWARE, LLC,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| **ATWORK GROUP, LLC,** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **JON JONES and JASON STEWART,** | ) | |
| | ) | |
| **Third-Party Defendants.** | ) | |
| | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Third-Party Defendants'
Motion to Dismiss [Doc. 30], the Plaintiff's Motion for Judgment on the
Pleadings [Doc. 32], the Defendant's Motion to Exclude [Doc. 48], the Third-
Party Defendants' and Plaintiff's joint Motion for Summary Judgment [Doc.
49], and the Defendant's Motion for Summary Judgment [Doc. 50].

## I.    PROCEDURAL BACKGROUND

This case arises from a contract dispute between AnthroWare, the
Plaintiff software company, and AtWork Group, the Defendant staffing

agency. On September 18, 2024, the Plaintiff initiated this action by filing a Complaint against the Defendant in the Superior Court of Buncombe County, North Carolina. [Doc. 1-1]. The Defendant filed Notice of Removal to this Court on October 22, 2024. [Doc. 1]. On November 12, 2024, the Defendant filed an Answer and asserted Counterclaims against the Plaintiff. [Doc. 10].

The Plaintiff filed an Amended Complaint on April 10, 2025. [Doc. 20]. The Defendant filed an Amended Answer and asserted Amended Counterclaims against the Plaintiff on April 21, 2025. [Doc. 23]. The Defendant also filed a Third Party Complaint against AnthroWare's CEO Jon Jones and President Jason Stewart on May 2, 2025. [Doc. 25]. On June 4, 2025, Jones and Stewart filed both a Motion to Dismiss the Third Party Complaint [Doc. 30] and an Answer to the Third Party Complaint [Doc. 31], and the Plaintiff filed a Motion for Judgment on the Pleadings in Part [Doc. 32]. The Defendant filed a Response to both motions on June 25, 2025, [Doc. 36], and the Plaintiff and Third Party Defendants filed a Reply on July 2, 2025, [Doc. 40].

On October 9, 2025, the Defendant filed a Motion to Exclude the opinions of Michael Potts, the Plaintiff's expert. [Doc. 48]. That same day, the Third-Party Defendants filed a Motion for Summary Judgment [Doc. 49], the Plaintiff filed a Motion for Summary Judgment in Part [id.], and the

Defendant filed a Motion for Summary Judgment [Doc. 50]. The parties timely filed Responses [Docs. 51, 52, 53] and Replies [Docs. 54, 55, 56] to each of the dispositive motions. Having been fully briefed, this matter is ripe for adjudication.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As the Supreme Court has observed, 'this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

"Facts are material when they might affect the outcome of the case, and a genuine issue exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." Ballengee v. CBS Broad., Inc., 968 F.3d 344, 349 (4th Cir. 2020) (quoting News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010)). When ruling on a motion for summary judgment, the Court does not "weigh the

evidence or make credibility determinations." Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016) (quoting Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 568-69 (4th Cir. 2015)).  "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact."  Bouchat, 346 F.3d at 522.  If this showing is made, the burden then shifts to the nonmoving party, who must convince the Court that a triable issue does exist.  Id.

Where, as here, the parties each move for summary judgment, the Court "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citation omitted).  In considering each of the motions for summary judgment, the Court must view the pleadings and materials presented in the "light most favorable" to the nonmovant and must "draw all reasonable inferences" in the nonmovant's favor.  Adams v. UNC Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

## III. FACTUAL BACKGROUND

The forecast of evidence in this matter is documented and undisputed except as specifically identified herein.

### 1. The Parties and the Software

AtWork is a professional staffing agency with a presence in one hundred locations across thirty states. [Doc. 25 at 2-3]. For decades, AtWork paid to use a web-based software platform called TempServ that was designed to help staffing agencies manage their operations, including several back-office functions critical to the staffing industry. [Id. at 3]. Eventually, AtWork acquired the company that owned TempServ. [Id. at 4]. After acquiring the company, AtWork wanted an outside consultant to evaluate the TempServ product. [Id.]. In September 2021, AnthroWare—a technical consulting, creative services, and software development firm—submitted an evaluation proposal to AtWork. [Id.; Doc. 49-1 at 1; see also Doc. 49-8 at 4-15]. AtWork ultimately selected AnthroWare to evaluate the TempServ product and develop recommendations regarding its future use.

### 2. Master Services Agreement

AnthroWare and AtWork entered a Master Services Agreement ("MSA") on February 7, 2022. [Doc. 20-2 at 1, 8]. Under the MSA, AnthroWare agreed "to provide technical consulting services" and "to plan

5

work to be performed in specific periods of time, defined in associated Statement(s) of Work." [Id. at 2]. AtWork and AnthroWare agreed to "work together to define which work will be performed in any given time period." [Id.]. They also agreed that if AnthroWare "fail[ed] to deliver its agreed upon body of work in a given time period" due to a delay caused by AtWork, then AnthroWare would "not be held liable for that delay." [Id.].

AnthroWare agreed that its services would "be performed in a diligent ethical, and workmanlike manner and in accordance with the schedules and parameters set forth by [AtWork]," and that the "content, style, form, and format of any work product of the Services [would] be consistent with the requirements of [AtWork]." [Doc. 20-3 at 1]. Additionally, AnthroWare warranted that the "employees performing the Services [would] have sufficient expertise, training and experience performing such services." [Id.].

The MSA provided that AnthroWare's work would be "billed as hourly (time and materials) work." [Id.]. Accordingly, AnthroWare agreed that its "Invoices shall reflect hours actually worked and recorded in [AnthroWare's] time tracking tool," and "[a]n accounting of all hours worked may be provided, if requested by [AtWork]." [Doc. 20-4 at 1]. However, AnthroWare admits that it "did not maintain time sheets" for any of the work that it performed for AtWork under the MSA. [Doc. 55-1 at 4, 7].

6

Additionally, the MSA provided that all intellectual property made by AnthroWare pursuant to work performed under the MSA "shall be the property of [AtWork]." [Doc. 20-2 at 2]. However, the MSA also provided that "all work and IP produced by [AnthroWare] while rendering the Services is the property of [AnthroWare] until final payment is received." [Id. at 3]. The parties subsequently entered three Statements of Work under the MSA.

### 3. SOW-1

Contemporaneously with entering into the MSA, the parties executed SOW-1, their first Statement of Work under the MSA. [Doc. 49-1 at 163]. Under SOW-1, AnthroWare agreed to evaluate the TempServ software and develop a "plan for designing and rebuilding the TempServ product." [Id. at 159]. In exchange for that service, AtWork agreed to pay a $25,000 monthly retainer to AnthroWare for four months. [Id. at 162]. Pursuant to its work under SOW-1, AnthroWare recommended building a new product to replace the TempServ software. [Doc. 50-1 at 3].

### 4. SOW-2, 2.1, and 2.2

On April 22, 2022, while AnthroWare's work under SOW-1 was ongoing, AnthroWare and AtWork executed SOW-2, a second Statement of Work under the MSA. [Doc. 49-1 at 174]. The purpose of SOW-2 was to develop a thorough understanding of the TempServ product, document the

7

product's features, and lay the groundwork for the development of a replacement product. [Doc. 50-6 at 6-10]. To that end, AnthroWare agreed to provide AtWork a senior software developer for forty hours per week, along with a project manager for approximately four hours per week, to "document institutional knowledge" about the TempServ software, "map data" in preparation for data migration into a new software product, and "set up the 'new build' for success and help sunset the current system safely and effectively." [Doc. 49-1 at 169-70]. In exchange for that service, AtWork agreed to pay a $18,144 monthly retainer to AnthroWare for an estimated duration of twelve months. [Id. at 173].

On March 7, 2023, the parties executed a change order, SOW-2.1, that increased the project manager's commitment to sixteen hours per week and raised the monthly retainer to $23,126.04 for the two remaining months of the project's twelve-month duration. [Id. at 183, 185-86]. On April 24, 2023, the parties agreed to another change order, SOW-2.2, that extended the duration of the project by three months, through July 2023. [Id. at 190, 197-98]. Even though not documented with a change order, after July 2023 AtWork paid the $23,126.04 retainer for an additional two months for a continuation of the work provided pursuant to SOW-2, 2.1, and 2.2. [Doc. 20 at 5; Doc. 50-6 at 6].

## 5. SOW-3 and 3.1

On May 26, 2022, just prior to the expiration of SOW-1, AnthroWare and AtWork executed SOW-3, the "TempServ 2.0 Build," a third Statement of Work under the MSA. [Doc. 20-5 at 1-2, 7]. According to SOW-3's "project summary," AnthroWare agreed to build "a minimum viable product to supplant TempServ." [Id. at 2]. The minimum viable product would "include both functionality that is derived (and updated) from the current system, as well as functions that are happening outside the current system," based on a "functionality list" that was developed after months of research. [Id.].

SOW-3 contained only one "High Level Deliverable[ ]": to "[p]rovide a product development team allocated to build the next evolution of the TempServ product." [Id. at 4]. The project was "structured to work with a product team of 5.5 FTE"—i.e., a full-time equivalent of five and a half employees. [Id. at 4]. AtWork agreed to pay AnthroWare "a monthly recurring retainer" of $144,837 for the 5.5 FTE product team, on the understanding that a "change order" against SOW-3 would be required if AnthroWare needed "to adjust the 5.5 FTE product team allocation or change deliverables or timeline." [Id. at 6]. The contract "estimated that the Deliverables in this SOW will take approximately sixteen (16) months to complete," and the initially scheduled release date for the new product was

in November 2023.  [Id.; Doc. 10-9 at 2].  Additionally, SOW-3 provided that any additions, amendments or modifications to SOW-3's "terms (and attached Services Specifications, Software Specifications, and Scope of Work) must be in writ[ing] and designated as further Exhibits to the Contract herein and signed by authorized representations of the parties to be valid."  [Doc. 20-5 at 7].

Upon the execution of SOW-3, AnthroWare began building a software product to replace TempServ, and AtWork began paying $144,837 each month to AnthroWare.  [Doc. 51-2 at 34-51].  To document progress on the project, AnthroWare provided AtWork nearly weekly updates between May 26, 2022 and June 13, 2024.  [Doc. 49-3 at 18-110].  Between May 26, 2022 and December 14, 2022, AnthroWare represented that the "Product Build" was fully "on track."  [Id. at 18-42].  From January 12, 2023 through June 28, 2023, AnthroWare represented that the product build's timeline was "at risk" but that the rest of the project was still "on track."  [Id. at 43-65].

By the summer of 2023, due to AtWork's concern about the project's progress, AtWork had engaged UHY Consulting Inc. ("UHY") and Darin Berkley, an independent contractor, to assist AnthroWare with certain aspects of the project.  [Doc. 50-9 at 10].  In early June 2023, AnthroWare and UHY agreed that a significant function of the new TempServ product—

10

the "cash application"—should be offloaded onto a separate platform rather than built by AnthroWare.  [Doc. 50-3 at 37, 39, 48; Doc. 50-10 at 2-4].[1] AnthroWare first shared that recommendation with AtWork between June 5 and June 7, 2023, but AtWork did not immediately make a decision regarding the recommendation.  [Doc. 50-9 at 4; Doc. 50-11 at 2].  On June 23, 2023, AnthroWare prepared SOW-3.1, a proposed change order intended to extend the project's completion date by four months to March 31, 2024. [Doc. 20-6 at 1-2].  Despite the pending recommendation to offload the cash application, AnthroWare continued to include the cash application in the functionality list incorporated into SOW-3.1.  [Doc. 50-1 at 4; Doc. 50-4 at 47; Doc. 50-8 at 5; Doc. 50-9 at 4, 10].  On June 26, 2023, during a meeting between AnthroWare, UHY, and Darin Berkley, AnthroWare President Jason Stewart represented that AnthroWare was "90 percent of the way" to "Version 0.5" of the new product and had completed the payroll, invoicing, and taxes parts of that version, with the exception of integrating the taxes part into the payroll part.  [Doc. 53-3 at 4].  On July 5, 2023, AnthroWare and AtWork executed SOW-3.1, which effected a change in the timeline only.  [Doc. 20-

---

[1] The parties disagree about who initially made this recommendation.  AnthroWare contends that UHY initially made this recommendation.  [Doc. 50-3 at 37, 48].  AtWork and Cory McNeley, the Director of UHY, contend that AnthroWare initially made this recommendation.  [Doc. 50-1 at 4; Doc. 50-9 at 7; Doc. 50-10 at 2-3].

6 at 2, 7-8].  AtWork contends that it agreed to extend the project's timeline in reliance on AnthroWare's representations regarding its progress on the product.  [Doc. 53 at 6].

AnthroWare subsequently represented that the product build was again fully "on track" between July 6, 2023 and October 16, 2023.  [Doc. 49-3 at 66-78].  Between October 19 and November 9, 2023, AnthroWare represented that the product build's timeline, budget, and functional requirements document were "at risk" but that the build's scope, and the build overall, were still "on track."  [Id. at 79-82].

In November 2023, AtWork accepted AnthroWare and UHY's recommendation to offload the cash application and related functions to a separate platform, and AtWork engaged UHY and Crestwood, another vendor, to develop that aspect of the project.  [Doc. 50-1 at 4-5; Doc. 50-3 at 39, 49; Doc. 50-11 at 2].  The parties disagree about the extent to which this decision reduced the scope of AnthroWare's work under SOW-3.  AtWork contends that the cash application represented twenty-five percent of the original project.  [Doc. 50-1 at 4].  AnthroWare contends that the cash application represented as little as four or five percent of the original project. [Doc. 50-4 at 48].

### 6. Revised Payment Schedule and SOW-3.2

On November 27, 2023, soon after accepting the recommendation to offload the cash application, AtWork informed AnthroWare that it was "highly concerned" about the state of the project. [Doc. 51-2 at 78]. Specifically, AtWork stated that because the "cash application and related functions were included in the [minimum viable product]," AtWork no longer believed that AnthroWare could deliver the minimum viable product contracted for in SOW-3 and 3.1. [Id. at 78-79]. As a result, AtWork proposed revising its monthly payment schedule to account for work that was part of SOW-3 and 3.1 but was being reallocated to third-party vendors at additional cost to AtWork. [Id. at 79]. Following AtWork's initial proposal, the parties negotiated the terms of a revised payment schedule. [Id. at 55-79].

The parties settled on a framework for the payment schedule in late December. On December 21, 2023, AnthroWare proposed a payment schedule that involved reduced payments between December 2023 and July 2024. [Id. at 58-60]. Under AnthroWare's proposal, AtWork would pay AnthroWare $100,000 each month between December 2023 and March 2024, $43,741 each month between April 2024 and June 2024, and $100,000 in July 2024. [Id. at 58-59]. Additionally, AtWork would provide a promissory note for $20,000 each month between December 2023 and

March 2024, as well as in July 2024, that would be due as a $100,000 lump sum payment in August. [Id.]. On December 29, 2023, AtWork proposed adopting that revised payment schedule with one exception—namely, that the deferred $100,000 lump sum payment would be tied to "the successful launch of the platform" rather than function as a series of promissory note obligations. [Id. at 57]. Before receiving AnthroWare's response, AtWork paid AnthroWare the first two $100,000 monthly payments that would be due for work in December and January under the proposed plan.[2] [Id.]. In response to AtWork's proposal, AnthroWare asked for clarification regarding AtWork's definition of a "successful launch," noting that AnthroWare was "looking for a way to say 'yes.'" [Id.]. AtWork responded that its "goal would be to tie it to when we 'go live' with the total franchise system (7/1/24)." [Id. at 56-57]. AnthroWare's response—"Thanks so much for this, we will run with it and put some language together so that we can update our payment schedule and move forward"—concluded the negotiations on January 5, 2024. [Id. at 55]. On January 24, 2024, AnthroWare invoiced AtWork in accord with the revised payment plan—the invoice reflected a $100,000

---

[2] Before the parties settled on the terms of the revised payment plan, AnthroWare invoiced AtWork at the original rate in November and December 2023 for work to be performed in December and January. [Doc. 50-5 at 2; Doc. 50-9 at 15]. AtWork made the initial two $100,000 payments based on its expectation that this monthly payment amount would be part of the revised payment plan that was being negotiated. [Id.].

payment due by January 31, 2024 and an additional $20,000 balance to be paid later.  [Id. at 52].  AtWork paid the invoice, and AnthroWare accepted the payment without dispute.  [Doc. 50-1 at 6; Doc. 50-5 at 2; Doc. 50-14 at 9].

On January 31, 2024, AnthroWare provided AtWork with a change order, SOW-3.2, that incorporated the negotiated revisions to the payment plan.  [Doc. 51-2 at 93-94, 116].  SOW-3.2's "Scope Change Log" noted that "[p]er negotiation decision made by Jon Jones [of AnthroWare] and Jason Leverant [of AtWork] through December 2023, the monthly bill rate has changed and a deferred fee structure has been designed."  [Id. at 84].  However, SOW-3.2 changed the trigger for the $100,000 deferred payment, stating that it would "become due thirty (30) days after at least one AtWork Tenant has completed 30 calendar-days of use in the live environment (PILOT), or on 7/30/2024, whichever is sooner."  [Id. at 93].

SOW-3.2 also included many other changes.  For example, although SOW-3.2 preserved the project summary from SOW-3 and 3.1 verbatim, it included a wholesale revision of the "Deliverables" section.  [Id. at 86, 88-91].  The new "High Level Deliverable[ ]" was to "[b]urn down the remaining work related to the locked feature set" of the TempServ software product.  [Id. at 88].  The locked feature set was a "list of workflows and required

functions" that was produced collaboratively by AnthroWare and AtWork, and SOW-3.2 noted that "[a]dditions to this list of required functions and workflows are considered a change in scope and must be treated as such." [Id. at 89]. On February 14, 2024, AnthroWare again invoiced AtWork in accord with the revised payment plan, with $100,000 due by February 29, 2024 and an additional $20,000 balance to be paid later. [Id. at 53].

On February 15, 2024, AtWork provided AnthroWare with comments, questions, and change requests for SOW-3.2. [Id. at 115]. Regarding the deferred $100,000 payment, AtWork requested that AnthroWare remove the clause providing that the payment would be due "on 7/30/2024" even if the platform had not yet launched. [Id. at 108]. AtWork instead reiterated its agreement "to release deferred payment upon successful go-live of pilot." [Id.]. AtWork also pushed back on SOW-3.2's discussion of the list of workflows and required functions. [Id. at 104]. Specifically, AtWork stated its understanding that "[t]he project has always been to replace TempServ with an updated system," and AtWork expressed concern that some of the features necessary to accomplish that goal might be missing from the current list of workflows and required functions. [Id.]. AtWork requested that "the language better match what [it] originally signed up for." [Id.].

In response, on February 19, 2024, AnthroWare rejected AtWork's counterproposal regarding the deferred payment and the language about the list of workflows and required functions as "impossible." [Id. at 114]. AtWork subsequently paid AnthroWare the $100,000 due under the February 14 invoice, and AnthroWare accepted the payment without dispute. [Doc. 50-1 at 6; Doc. 50-5 at 2; Doc. 50-14 at 9].

Neither party signed SOW-3.2. Nevertheless, AnthroWare invoiced AtWork in accord with the revised payment schedule for the month of April, and AtWork paid the $43,741 invoice. [Doc. 50-14 at 9]. The terms of SOW-3.1 without the email modification would have expired at the end of March 2024, but AnthroWare continued to invoice AtWork in accord with the revised payment schedule. [Id.]. AtWork paid AnthroWare's two subsequent $43,741 invoices, and AnthroWare accepted payment without dispute. [Id.]. At the end of May 2024, AnthroWare informed AtWork via email that "after the payment due at the end of June to reserve the team for July . . . [AnthroWare] was going to need to move back to the original [$]144,000" monthly rate for work in subsequent months. [Doc. 50-3 at 59].

### 7. Termination of the Project

As late as June 13, 2024, AnthroWare's progress report projected a "Pilot Franchise Go Live" date for the product on June 24, 2024 and a "Big

Bang Go Live" date on July 22, 2024. [Doc 49-3 at 110]. However, the product did not go live on either date. AnthroWare again invoiced AtWork in accord with the revised payment plan—a payment of $100,000 plus a deferred balance of $20,000—for the month of July, but this time AtWork withheld payment. [Doc. 50-5 at 2; Doc. 50 at 8-9].

On July 2, 2024, AnthroWare President Jason Stewart informed AtWork that AnthroWare expected payment of $428,777—$100,000 for work in July 2024, as well as an "accrued balance" of $328,777. [Doc. 50-14 at 6-10]. The $100,000 payment for work in July represented the final payment in the revised payment schedule negotiated the prior December. [Id. at 9-10]. The first $100,000 of the $328,777 accrued balance represented the sum of the five deferred payments of $20,000 for work in December through March plus July. [Id. at 9]. The remaining $228,777 of the $328,777 accrued balance represented a retroactive bill of $76,259 per month for work in April through June. [Id.]. Stewart arrived at that number by arguing that AtWork should have paid $120,000 for each of those months, rather than the $43,741 AtWork actually paid per month in accord with the revised payment schedule, because AnthroWare "maintained a full-sized team" during those months instead of scaling down its team as it had originally anticipated. [Id.].

18

On July 9, 2025, AtWork refused this request for payment. [Id. at 3-4]. AtWork agreed to pay $43,000 for work in July, representing a downward departure from the revised payment schedule, which called for a $100,000 payment with an additional $20,000 balance. [Id. at 3]. AtWork argued that this downward departure was warranted because it had agreed to the $120,000 combined payment for July based on AnthroWare's representation that there would be "additional effort required to 'go live' in July," but the product did not in fact go live in July. [Id.]. Instead, AtWork asserted that the $43,000 payment for July "should be sufficient to transition any remaining code" to AtWork so that AtWork could finish the project on its own. [Id.].

On July 11, 2024, AnthroWare CEO Jon Jones responded and demanded immediate payment of $49,412, as well as an additional payment of $482,425.64 to "secure work product" created between April 1 and July 10, 2024. [Id. at 2]. According to Jones, the $49,412 represented the unpaid balance of the "total contracted value" of SOW-3.1. [Id.]. To reach that balance, Jones disregarded the revised payment schedule and assumed a payment obligation of $144,936[3] per month for work through March 2024.

--------

[3] This assumption was erroneous. Jones's assertion that "[t]he signed agreement placed a fee of $144,936 per month for 22 months" is inconsistent with the plain text of SOW-3 and SOW-3.1, both of which establish a monthly payment of $144,837. [Doc. 20-5 at 6; Doc. 20-6 at 7]. Every invoice in the record also establishes that the monthly payment under SOW-3 and 3.1 was $144,837. [Doc. 51-2 at 34-51]. However, starting with the

[Id.].  Jones then subtracted the sum of all payments made by AtWork to AnthroWare for invoices under SOW-3 and 3.1—eighteen months at $144,837, four months at $100,000, three months at $43,741, and nine months of an additional $99 software expense[4]—to reach a balance of $49,412.  [Id.].  Jones maintained that the additional payment of $482,425.64 represented the sum of monthly payments of $144,936 for work in April, May, June, and July 1-10 on a prorated basis.[5]  [Id.].  Jones informed AtWork that if AnthroWare did not receive the $49,412 payment by the end of the next business day, he would have "no option but to lay off the team immediately," and that, in turn, would make it "impossible" for AnthroWare to hand off the remaining code to AtWork.  [Id.].

AtWork refused this request for payment, and AnthroWare stopped performing.  Two months later, on September 18, 2024, AnthroWare initiated this suit against AtWork.  [Doc. 1-1].

---

invoice dated 2/15/2023, AnthroWare began adding a "Reimbursable Expense" of $99 for "Usersnap Software" to the monthly invoice, bringing the total monthly payment to $144,936 for nine months through the invoice dated 10/15/2023.  [Id. at 43-51].

[4] See supra note 3.

[5] The Court has been unable to replicate any method by which Jones reached this figure, and AnthroWare's counsel offers no explanation.  If this were a true proration of the claimed $144,936 for July, it would constitute payment for 10.185 days, rather than 10 days.

## IV. DISCUSSION

### A. AtWork's Motion for Summary Judgment

#### 1. AnthroWare's Claims

The First Cause of Action in AnthroWare's Amended Complaint asserts that AtWork materially breached the MSA and SOW-3, as amended by SOW-3.1, by failing to pay, and repudiating its obligation to pay, the full amount due for services provided between December 2023 and March 2024. [Doc. 20 at 8]. The Second Cause of Action asserts a quantum meruit claim for the full reasonable value of labor and services that AnthroWare provided to AtWork between April 1, 2024 and July 10, 2024. [Id. at 8-9]. The Third Cause of Action asserts that, if the Court determines that the parties agreed to SOW-3.2, AtWork materially breached the terms of that agreement by failing to pay the amount due for services rendered in July 2024, repudiating the contract, terminating the contract with fewer than sixty days' notice, frustrating AnthroWare's ability to complete the product, and failing to pay the $100,000 deferred payment by July 30, 2024. [Id. at 9-11]. The Fourth Cause of Action seeks both a declaratory judgment that AnthroWare has not received final payment from AtWork and injunctive relief barring AtWork from using any work and intellectual property produced by AnthroWare pursuant to SOW-3. [Id. at 11-12].

AtWork moves for summary judgment on grounds that AnthroWare has failed to present a forecast of evidence to sustain any of these claims.

## 2. Governing Law

The express language of the MSA establishes that this dispute is governed by North Carolina law. [Doc. 20-2 at 7]. The parties disagree, however, as to whether SOW-3 is governed by the common law or the Uniform Commercial Code ("UCC"). [Doc. 51 at 8-13; Doc. 55 at 4].

North Carolina applies the "predominant factor" test to determine whether the common law or the UCC governs a mixed contract involving the sale of both goods and services. Hensley v. Ray's Motor Co. of Forest City, 580 S.E.2d 721, 724 (N.C. Ct. App. 2003). Under the predominant factor test, courts look to "(1) the language of the contract, (2) the nature of the business of the supplier, and (3) the intrinsic worth of the materials" to determine whether the predominant factor of the contract is "the rendition of services with the sale of goods incidentally involved" or "the sale of goods with the provision of services incidentally involved." Id. at 724-25 (citation and internal quotation marks omitted).

"It is the general law of contracts that the purport of a written instrument is to be gathered from its four corners." Ussery v. Branch Banking & Tr. Co., 777 S.E.2d 272, 279 (N.C. 2015) (citation and internal quotation marks

omitted).  When reviewing and interpreting contractual language, courts construe the various terms harmoniously, such that "[e]ach clause and word is considered with reference to each other and is given effect by reasonable construction."  Id.  "Another fundamental rule of contract interpretation is that a written contract is construed against the party who drafted it."  State v. Philip Morris USA Inc., 618 S.E.2d 219, 225 n.14 (2005) (citation and internal quotation marks omitted).

Here, SOW-3's language, which was drafted by AnthroWare, unambiguously establishes an agreement for AnthroWare to design and develop a custom software product for AtWork.  The title page for SOW-3 refers to the project as "TempServ 2.0 Build."  [Doc. 20-5 at 1].  The "Overview" of the project proposes the "build of a minimum viable product," discusses the "new build" and implementation of "a product," states the value of "building this product," and explains how the "new product" will function. [Id. at 2].  Although the "High Level Deliverable[ ]" of SOW-3 is to "[p]rovide a product development team," that team is "allocated to build the next evolution of the TempServ product."  [Id. at 4].  Moreover, SOW-3's "Timeline" estimates that "the Deliverables in this SOW will take approximately sixteen months to complete."  [Id. at 6].  This timeline cannot reasonably be construed as a timeline for merely providing a product development team.  It

is plainly a timeline for providing the product itself. As a result, AnthroWare's language obligates AnthroWare to provide a good—i.e., a minimum viable software product—to AtWork. For purposes of determining the governing law, however, the operative question for the Court is whether SOW-3's language requires a degree of custom design and development befitting a services contract to which the common law applies.

The North Carolina Business Court has observed that a consumer purchase of "a shrink-wrapped word processing program from the shelf" of an electronics store is "very clearly" a sale of a good, whereas a programmer's contract to "invent[] and develop[] new software for a particular customer" looks "more like a services contract." Smart Online, Inc. v. Opensite Techs., Inc., No. 01 CVS 09604, 2003 WL 21555316, at *4 (N.C. Super. June 17, 2003). The sale of "preexisting software," even when combined with "custom modifications or upgrades to adapt it to the user's needs," typically counts as a sale of a good. Id. (quoting Pearl Invs., LLC v. Standard I/O, Inc., 257 F. Supp. 2d 326, 353 (D. Me. 2003)); see also Waterfront Props., Inc. v. Xerox Connect, Inc., No. 3:04CV322-H, 2006 WL 267191, at *1, *5 (W.D.N.C. Jan. 31, 2006) (reaching the same conclusion when the seller provided "customized databases" for "preexisting software"). Neither side, however, has cited to any authority under North Carolina law

that addresses a contract like the one at issue here, which involves the design and development of software from scratch for a particular customer. Most courts that have addressed this issue have concluded that custom software development contracts are services contracts to which the common law applies.  See, e.g., Multi-Tech Sys., Inc. v. Floreat, Inc., No. CIV. 01-1320 DDA/FLN, 2002 WL 432016, at *3 (D. Minn. Mar. 18, 2002) ("The few cases considering the question indicate that the UCC does not apply to an agreement to design and develop a product, even if compensation under that agreement is based in part on later sales of that product."); Pearl, 257 F. Supp. 2d at 353 ("[F]or purposes of applicability of the UCC, development of a software system from scratch primarily constitutes a service."); Wharton Mgmt. Grp. v. Sigma Consultants, Inc., No. C.A. 89C-JA-165, 1990 WL 18360, at *1, *3 (Del. Super. Ct. Jan. 29, 1990), aff'd, 582 A.2d 936 (Del. 1990) (concluding that a contract to "design" and "develop" "customized computer software" was "exclusively or primarily" a contract for services); State v. Maximus, Inc., No. X06CV075011488S, 2009 WL 1142570, at *7 (Conn. Super. Ct. Apr. 1, 2009) (reviewing similar cases and concluding that "the degree of development and customization or programming that was required by the buyer" is a "significant factor" for determining whether a contract was predominantly for goods or services).

As a result, SOW-3's language, which shows that AnthroWare agreed to build a custom software product from scratch, supports a conclusion that SOW-3 is a contract to which the common law applies. The other two elements of the predominant factor test also support this conclusion. AnthroWare represents itself as a "boutique creative, digital product, marketing, and insights agency" that provides "technical and creative services" tailored to the needs of its clients. [Doc. 49-8 at 5; Doc. 20-3 at 2]. Moreover, the intrinsic worth of the materials at issue pales in comparison to the relevant labor costs. Accordingly, the Court concludes as a matter of law that the common law, rather than UCC, governs SOW-3, even though the subject of the contract was for AnthroWare to provide a product.

### 3. Modification of SOW-3 and 3.1

It is undisputed that the parties formally agreed to SOW-3 and SOW-3.1 but did not formally agree to SOW-3.2.[6] [Doc. 20-5 at 7; Doc. 20-6 at 8; Doc. 50-6 at 19; Doc. 50-14 at 2]. The question before the Court is whether, as a matter of law, the parties also agreed to a valid modification of SOW-3 and 3.1.

---

[6] AnthroWare concedes that the parties did not agree to SOW-3.2. [Doc. 51 at 7, 13; Doc. 50-3 at 25, 61; Doc. 50-14 at 2; 50-17 at 28]. As such, AnthroWare appears to have abandoned the Third Cause of Action in its Amended Complaint. [Doc. 20 at 9-11].

"Parties to a contract may, by mutual consent, agree to change its terms." Electro Lift, Inc. v. Miller Equip. Co., 166 S.E.2d 454, 456 (N.C. Ct. App. 1969). Well-settled North Carolina law establishes that "a written contract may ordinarily be modified by a subsequent parol agreement and such subsequent agreement may be either express or implied by conduct of the parties." Id. (citation omitted); see also 42 E., LLC v. D.R. Horton, Inc., 722 S.E.2d 1, 6-7 (N.C. Ct. App. 2012) (noting that for conduct to modify or waive a written contractual provision, such conduct must "naturally and justly lead[] the other party to believe the provisions of the contract are modified or waived" (citation and internal quotation marks omitted)).

A valid contract modification, however, "must possess all elements necessary to form a contract." Electro Lift, 166 S.E.2d at 456-57. "In the formation of a contract an offer and an acceptance are essential elements," and "the offer must be communicated, must be complete, and must be accepted in its exact terms." Dodds v. St. Louis Union Tr. Co., 170 S.E. 652, 653 (N.C. 1933). Additionally, "[c]ommon law principles dictate that traditionally, any alter[ation] [of] terms of a contract must be supported by new consideration." Canteen v. Charlotte Metro Credit Union, 900 S.E.2d 890, 894 (N.C. 2024) (internal citations and quotation marks omitted). "Consideration is present if there is a benefit to the promisor or a detriment

to the promisee."  Lannan v. Bd. of Governors of Univ. of N. Carolina, 913 S.E.2d 163, 171 (N.C. 2025).

Contract formation "results from the concurrence of minds of two or more persons, and its legal consequences are not dependent upon the impressions or understandings of one alone of the parties to it. It is not what either thinks, but what both agree."  Howell v. Smith, 128 S.E.2d 144, 146 (N.C. 1962) (citation and internal quotation marks omitted).  "The question whether a contract has been made must be determined from a consideration of the expressed intention of the parties—that is from a consideration of their words and acts."  Normile v. Miller, 326 S.E.2d 11, 17 (N.C. 1985) (citation and internal quotation marks omitted).  A party's "undisclosed intention is immaterial in the absence of mistake, fraud, and the like, and the law imputes to a person an intention corresponding to the reasonable meaning of his words and acts."  Howell, 128 S.E.2d at 146.  "If [a party's] words or acts, judged by a reasonable standard, manifest an intention to agree in regard to the matter in question, that agreement is established, and it is immaterial what may be the real but unexpressed state of his mind on the subject, as mental assent to the promises in a contract is not essential."  Id.  Accordingly, "the test of the true interpretation of an offer or acceptance is not what the party making it thought it meant or intended it to mean, but what a reasonable

person in the position of the parties would have thought it meant." Id. "When the parties use clear and unambiguous terms, the contract should be given its plain meaning, and the court can determine the parties' intent as a matter of law." Alaimo Family Chiropractic v. Allstate Ins. Co., 574 S.E.2d 496, 498 (N.C. Ct. App. 2002). "Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." Philip Morris USA, 618 S.E.2d at 225.

Here, because the record of the parties' email correspondence regarding the revised payment schedule and the subsequent invoices and payments in accord with that schedule is undisputed, the Court interprets the meaning of the parties' correspondence and conduct as a matter of law.

On December 21, 2023, amid negotiations about revising AtWork's payment obligations in conjunction with AnthroWare's recently revised product development obligations,[7] AnthroWare presented a contract modification offer to AtWork. [Doc. 51-2 at 58-60]. AnthroWare proposed a revised payment schedule: payments of $100,000 per month for December through March plus July, with an additional $20,000 for each of those months

_____

[7] When AtWork initiated these negotiations about payment on November 27, 2023, AtWork's rationale for doing so was that the parties' lengthy discussions regarding relieving AnthroWare of any responsibility for the cash application had recently resulted in a decision to shift responsibility for that work onto a different vendor. [Doc. 51-2 at 78-79].

deferred to July 31, 2024, plus payments of $43,741 per month for April through June.  [Id. at 59-60].

On December 29, 2023, AtWork expressed its willingness to agree to the payment schedule, but presented a counterproposal regarding the trigger for paying the $100,000 in deferred payments (5 x $20,000)—namely, to tie the payments "to the successful launch of the platform."  [Id. at 57].  After AtWork clarified what was meant by a "successful launch," AnthroWare responded affirmatively on January 5, 2024: "Thanks so much for this, *we will run with it* and put some language together so we can update our payment schedule and move forward."  [Id. at 55 (emphasis added)].  In anticipation of the conclusion of the negotiations on these terms, AtWork had paid the December and January payments in accord therewith.  [Id. at 57].  As part of its January 5, 2024 response, AnthroWare thanked AtWork "for releasing [the first two] payments *as we figured this out*; that means a lot to us and we appreciate it."  [Id. at 55 (emphasis added)].

On January 24, 2024, before AnthroWare "put some language together," AnthroWare invoiced AtWork in accord with the revised payment schedule—the invoice reflected a $100,000 payment due by January 31, 2024 plus a deferred $20,000 balance.  [Doc. 51-2 at 52].  AtWork paid the January invoice, and AnthroWare accepted the payment without dispute.

[Doc. 50-1 at 6; Doc. 50-5 at 2; Doc. 50-14 at 9]. In fact, every invoice that AnthroWare sent AtWork after January 5, 2024 requested payment consistent with the terms of the revised payment schedule, and AnthroWare accepted all of AtWork's payments on those invoices without dispute. [Doc. 50-1 at 6; Doc. 50-3 at 32, 59; Doc. 50-5 at 2; Doc. 50-14 at 9; Doc. 51-2 at 52-53]. AnthroWare gave no indication that it expected payment outside the terms of the revised payment schedule until after AnthroWare missed the "go-live" deadline and AtWork withheld payment on the final invoice for work in July 2024. [Doc. 50-3 at 32, 59; 50-14 at 6-10].

The Court gives the parties' words and acts their plain meaning. AnthroWare's statement that "we will run with it" is an acceptance of AtWork's counteroffer and a statement of AnthroWare's intent to document the parties' new agreement. Similarly, AnthroWare's expression of thanks to AtWork for releasing payments "as we figured this out" is a clear indication that the parties' negotiations had ended. Moreover, all of AnthroWare's subsequent conduct through June 2024 indicates that AnthroWare understood that it was bound by the terms of the revised payment schedule. As such, AnthroWare's January 5, 2024 email cannot reasonably be construed as a mere statement of AnthroWare's intent to continue negotiating at a later date. The Court

concludes as a matter of law that AnthroWare's affirmative response on January 5, 2024 was an acceptance of AtWork's counteroffer.

As required by the common law, the parties' agreement to the revised payment schedule was supported by new consideration: AtWork agreed to accept a product "with a *significant* piece missing (cash application and related accounting functions)," and AnthroWare agreed to accept less payment in exchange. [Doc. 51-2 at 79 (emphasis in original)]. Accordingly, the Court concludes as a matter of law that the parties' agreement to the revised payment schedule, including the term conditioning the deferred payment upon the successful launch of the software product on July 1, 2024, constituted a valid modification of SOW-3 and 3.1. Based on the forecasts of evidence, taken in the light most favorable to AnthroWare as the non-moving party, no reasonable jury could find facts to support any different conclusion.

AnthroWare resists this conclusion and contends that the emails lack the "essential terms for an agreement" because they "did not define the scope of the services or work that Anthroware would provide in exchange for the proposed payment schedule," and that AtWork's subsequent rejection of SOW-3.2 evinces the absence of such an agreement. [Doc. 51 at 14-15]. The forecast of evidence, however, cannot sustain that contention.

AnthroWare incorporated the revised payment schedule into its SOW-3.2 proposal, which AnthroWare presented to AtWork on January 31, 2024. [Doc. 51-2 at 83-96]. However, SOW-3.2 included terms inconsistent with the agreement reached earlier in the month[8] and introduced new terms not contemplated in the parties' prior negotiations.[9] [Id. at 88-91, 93, 104, 108]. As such, SOW-3.2 was a proposal for an additional modification that was rejected by AtWork. This unsuccessful attempt to reopen negotiations and modify other terms of SOW-3 does not affect the validity of the parties' prior agreement. To the extent that AnthroWare, at the time of its January 5, 2024 email, may have harbored an undisclosed intention to continue negotiating the terms of the deferred payment, such undisclosed intention is immaterial. AnthroWare's words and acts, including AnthroWare's decision to begin invoicing AtWork in accord with the revised payment schedule *before* preparing SOW-3.2, constitute an acceptance of AtWork's counteroffer, yielding a valid contract modification.

---

[8] SOW-3.2 proposed a different trigger for the $100,000 deferred payment, providing that the deferred payment would "become due thirty (30) days after at least one AtWork Tenant has completed 30 calendar-days of use in the live environment (PILOT), *or on 7/30/2024, whichever is sooner*." [51-2 at 93 (emphasis added)].

[9] SOW-3.2 included a wholesale revision of the "Deliverables" section, including a new "High Level Deliverable[ ]" and several pages of terms regarding the product's infrastructure, features, and integrations and the parties' communications and decision-making obligations. [Doc. 51-2 at 88-91].

The Court notes that SOW-3 and 3.1 contain provisions that require any modifications to SOW-3 and 3.1's "terms (and attached Services Specifications, Software Specifications, and Scope of Work)" to be "signed by authorized representations of the parties." [Doc. 20-5 at 7; Doc. 20-6 at 8]. However, North Carolina courts have concluded that contractual provisions requiring "any modification of the contract to be in writing" or declaring that "[n]o salesman or agent of the company shall have the right to change or modify this contract" do not, in fact, bar such modifications. 42 E., 722 S.E.2d at 7 (citation and internal quotation marks omitted). Moreover, even a contract's "no waiver" provision may be subsequently waived because "the nonwaiver clause itself, like any other term of the contract, is subject to waiver by agreement or conduct during performance." Town of Forest City v. Florence Redevelopment Partners, LLC, 896 S.E.2d 653, 659 (2024) (citation and internal quotation marks omitted).

Here, both parties acted in accord with the modification to SOW-3.1 in the invoicing and payment of the amounts due thereunder. This manifests a bilateral understanding that the parties were proceeding with the contract as modified, waiving the requirement of formal documentation and signature.[10]

---

[10] The modification was, of course, in writing: emails. As such, this is not a waiver of the writing requirement, but only of the formality. There are no signature, but it us undisputed

Moreover, the forecast of evidence shows that the "attached Services Specifications, Software Specifications, and Scope of Work" were subject to significant changes across the course of the project without corresponding formal, signed modifications to those attachments. For example, the parties agreed to offload the cash application onto another platform and outsource its development to other vendors, but they never executed a formal, signed modification of the functionality list to remove the cash application. The forecast of evidence also indicates that the parties did not always execute formal change orders when they agreed to change payment schedules and deadlines. For example, it is undisputed that AnthroWare invoiced AtWork and AtWork paid for two additional months of work pursuant to SOW-2 after the expiration of SOW-2.2. [Doc. 20 at 5; Doc. 50-6 at 6].

Accordingly, the Court concludes as a matter of law that the parties' course of performance reveals a clear intent to waive the contractual provisions requiring all modifications to be formal, signed exhibits to the contract. The parties' agreement to the revised payment schedule was consistent with the parties' course of performance across their longstanding

that the respective participants in the email exchange had authority. Lastly, Jones was the CEO of AnthroWare, and not some mere "salesman or agent." As such, that provision also need not have been waived. AnthroWare's waiver was, thus, quite minor and clearly manifested by word and performance

partnership.  Once again, based on the forecasts of evidence, taken in the light most favorable to AnthroWare as the non-moving party, no reasonable jury could find facts to support any different conclusion.

### 4.  The Contract

Having concluded that the parties validly agreed to modify SOW-3 and 3.1, the Court now interprets the contract between the parties as a matter of law.  SOW-3 is a contract for AtWork to pay AnthroWare to perform the service of creating a minimum viable product to replace TempServ.  As modified by SOW-3.1 and the parties' agreement to the revised payment schedule, SOW-3 provides that, beginning with December 2023, AtWork was obligated pay AnthroWare according to the following schedule: $100,000 per month for four months, December 2023 through March 2024; $43,741 for three months, April 2024 through June 2024; and $100,000 for July 2024. AtWork was also obligated to pay AnthroWare an additional $100,000 if the product was successfully launched by July 1, 2024.  AnthroWare was obligated to create and deliver a minimum viable product in accordance with the specifications incorporated into SOW-3, except that AnthroWare was relieved of the obligation to build the cash application and related functions.

It is undisputed that AtWork made all of the payments contemplated by the revised payment schedule except for the $100,000 payment for work in

July 2024 and the $100,000 payment that was conditioned on the product's successful launch. It is also undisputed that the product was never successfully launched and that AnthroWare stopped performing under the contract no later than July 12, 2024. However, questions of material fact remain regarding breach—including whether AnthroWare committed a first material breach that excused some of AtWork's payment obligations.

Accordingly, the Court will grant summary judgment in part in favor of AtWork on AnthroWare's First Cause of Action. However, to the extent that the First Cause of Action asserts a breach of the contract as interpreted by the Court herein, the Court will deny summary judgment in part to AtWork on that cause of action. The Court will also deny summary judgment to AtWork as to the Fourth Cause of Action, which seeks remedies predicated on the underlying breach of contract claim. Because the Court has concluded that a valid contract existed through July 2024 and that the parties did not agree to SOW-3.2, the Court will grant summary judgment to AtWork as to AnthroWare's Second and Third Causes of Action.

### B.    Remaining Motions

AnthroWare moves for summary judgment on the breach of warranty components of AtWork's breach of contract counterclaim and on AtWork's fraudulent misrepresentation, negligent misrepresentation, and professional

negligence counterclaims.[11]  [Doc. 49].  The Third Party Defendants also move for summary judgment on AtWork's fraudulent misrepresentation and negligent misrepresentation claims.  [Id.].  As to AtWork's breach of contract counterclaim, summary judgment is denied.

In order to bring a fraudulent or negligent misrepresentation claim, a party must identify the purported misrepresentations "with particularity so that the defendant can understand the time, place and content of the representation, the identity of the person making the representation, and how the plaintiff justifiably relied on that information."  Value Health Sols., Inc. v. Pharm. Rsch. Assocs., Inc., 891 S.E.2d 100, 114 (N.C. 2023).  Additionally, the purported misrepresentations must "constitute material representations of fact, as opposed to mere puffery."  Glob. Hookah Distributors, Inc. v. Avior, Inc., 401 F. Supp. 3d 653, 659 (W.D.N.C. 2019).  "Courts have held indefinite statements of corporate optimism to be puffery," and "[t]he line between corporate optimism and material statements falls where the statements at issue were specific factual allegations that were not simply sales pitches but rather can be proven true or false—and, if properly supported, could be found

---

[11] AtWork also asserts a counterclaim for unjust enrichment in the event that the Court concludes that the contract between AtWork and AnthroWare is void or unenforceable. [Doc. 23 at 50].  Because the Court concludes as a matter of law that SOW-3, as modified by SOW-3.1 and the revised payment schedule, is neither void nor unenforceable, the Court will dismiss AtWork's unjust enrichment claim.

material by a reasonable jury." Id. at 659 (citations and internal quotation marks omitted). Moreover, the purported representations must misrepresent "existing or ascertainable facts, as distinguished from a matter of opinion or representation relating to future prospects." Value Health Sols., 891 S.E.2d at 119 (citation and internal quotation marks omitted).

Here, AtWork's forecast of evidence fails to identify with particularity any adequate predicate statement for AtWork's misrepresentation claims. General statements about the ability of AnthroWare's employees, the status of AnthroWare's progress on the project, the estimated timeline for the project's completion, and AnthroWare's future performance will not suffice. Accordingly, the Court will grant summary judgment to AnthroWare and to the Third Party Defendants on AtWork's misrepresentation claims.

The Court will also grant summary judgment to AnthroWare as to AtWork's professional negligence claim, which the Court concludes is barred by the economic loss rule. See Crescent Univ. City Venture, LLC v. Trussway Mfg., Inc., 852 S.E.2d 98, 101-04 (N.C. 2020); Johnson Bros. Corp. v. City of Charlotte, No. 23CVS002076-590, 2024 WL 808823, at *2-*6 (N.C. Super. Feb. 27, 2024); Legacy Data Access, Inc. v. Cadrillion, LLC, 889 F.3d 158, 164 (4th Cir. 2018); Apex Tool Grp. LLC v. Cyderes, LLC, No.

323CV00236KDBSCR, 2023 WL 7490146, at *4, *7-*8 (W.D.N.C. Nov. 13, 2023).

AtWork moves to exclude the opinions of Michael Potts, AnthroWare's software expert. [Doc. 48]. Because the Court has not relied on Potts's opinions at summary judgment, the Court will deny AtWork's motion without prejudice.

Finally, AnthroWare's pending Motion for Judgment on the Pleadings in Part [Doc. 32] and the Third Party Defendants' pending Motion to Dismiss [Doc. 30] will be denied as moot.

## V.    CONCLUSION

The parties may proceed to trial on their breach of contract claims to the extent that they assert a breach of SOW-3 as interpreted by the Court herein. This matter will be set for jury trial during the March 9, 2026 trial term.


## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 50] is hereby **GRANTED IN PART** and **DENIED IN PART**. As to the First Cause of Action in the Plaintiff's Amended Complaint [Doc. 20], summary judgment is **DENIED IN PART** to the extent

that the First Cause of Action asserts a breach of the contract as interpreted by the Court herein; summary judgment is otherwise **GRANTED IN PART** as to the First Cause of Action.  As to the Second and Third Causes of Action in the Plaintiff's Amended Complaint [Doc. 20], summary judgment is hereby **GRANTED**.  As to the Fourth Cause of Action in the Plaintiff's Amended Complaint [Doc. 20], summary judgment is hereby **DENIED.**

**IT IS FURTHER ORDERED** that the Third Party Defendants' Motion for Summary Judgment and Plaintiff's Motion for Summary Judgment in Part [Doc. 49] is hereby **GRANTED IN PART** and **DENIED IN PART**.  Summary judgement is **GRANTED** as to Counts II, III, and IV of the Defendant's Amended Counterclaims [Doc. 23] and Counts I and II of the Defendant's Third Party Complaint [Doc. 25].  Summary judgment is **DENIED** as to Count I of the Defendant's Amended Counterclaims [Doc. 23].

**IT IS FURTHER ORDERED** that the Defendant's Motion to Exclude the Opinions of Michael Potts [Doc. 48] is hereby **DENIED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that the Plaintiff's Motion for Judgment on the Pleadings in Part [Doc. 32] is hereby **DENIED** as moot.

**IT IS FURTHER ORDERED** that the Third Party Defendants' Motion to Dismiss [Doc. 30] is hereby **DENIED** as moot.

**IT IS FURTHER ORDERED** that Count V of the Defendant's Amended Counterclaims [Doc. 23] is hereby **DISMISSED**.

**IT IS FURTHER ORDERED** that this case is set for jury trial during the March 9, 2026 trial term.

**IT IS SO ORDERED.**

Signed: January 6, 2026

Martin Reidinger
Chief United States District Judge